DECISION AND JUDGMENT
{¶ 1} Appellant/cross-appellee, Jeffery A. King, appeals from an entry of judgment in favor of appellee/cross-appellant, CSX Transportation, Inc. ("CSXT") in the above-captioned case. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On January 20, 2005, King was injured, while performing his duties as a conductor for CSXT, when he fell from the side of a moving railcar. Minutes after the *Page 2 
incident, emergency medical services arrived on the scene. King was subsequently transported to Bay Park Hospital, where he was treated for a sprained knee and a lumbar strain.
 {¶ 3} At the hospital, King was interviewed by Terminal Superintendent John Morris, and Assistant Terminal Superintendent, Josh Claus. King claimed that he had lost his grip on the railcar and that his anti-slip footwear did not allow his foot to move naturally when he landed on the ground.
 {¶ 4} Shortly after the interview, King completed an incident report, in which he stated as follows:
 {¶ 5} "[I] was riding the side of a car, reached for microphone to tell switchman S.A. Tucker to stop the movement, I lost my grip on car and fell off, landed on my left knee, then rolled on the ground. * * *
 {¶ 6} "When I fell, the boots with spikes (company provided and required) dug in, not allowing my foot to be able to move. The momentum of moving and the abrupt stop of my left foot caused my knee to flex to the right. I felt the knee `pop' upon impact."
 {¶ 7} On July 7, 2006, King filed suit against CSXT, pursuant to the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 et seq. (2000), in connection with the January 20, 2005 accident.
 {¶ 8} Trial in the matter was held, before a jury, over a period of five days, beginning on August 27 and ending on August 31, 2007. At trial, King raised as his *Page 3 
theory of negligence the notion that the totality of his equipment, including his radio, boots, remote-control pack and lantern, caused his fall from the railcar.
 {¶ 9} In support of his claim, King testified to the following. To perform his job, he was required to wear and use specific equipment. On January 20, 2005, when the accident occurred, King was required to wear and operate a remote control pack (which was worn as a vest across his chest); he was required to carry his railroad issued lantern in his hand; he was required to wear and operate his railroad radio (which included a lapel microphone); and, because the conditions involved winter weather, he was required to wear spiked overshoes.
 {¶ 10} At approximately 2:15 a.m., King mounted the side of an autorack railcar as part of his job. While riding the railcar, he attempted to radio his co-worker to stop the movement of the train so that he could dismount the railcar. To use the radio, King let go of the moving railcar with one hand. As he did this, he was unable to maintain a secure connection to the railcar, and, as a result, he fell to the ground and was injured.
 {¶ 11} When asked, on direct examination, what caused the fall, King answered:
 {¶ 12} "I believe it was just, it was the combination of having to hold the lantern, the belt pack, you know, the kind of unnatural position you're in, and the boots in combo with everything it just caused me to lose my grip."
 {¶ 13} On cross-examination, defense counsel elicited acknowledgement from King that King had been wearing, in addition to the above-stated equipment, a pair of *Page 4 
gloves and, over the gloves, a pair of mittens. The glove-mitten combination was not required by CSXT; instead, it was chosen (and purchased separately) by King.
 {¶ 14} Defense counsel was also able to elicit from King testimony to the effect that, during a previous incident, in February 2004, where King claimed that his feet had slipped off a railcar, King had only worn gloves — as opposed to the glove-mitten combination — and, in that case, was able to hang on with his hands.
 {¶ 15} In addition, CSXT provided testimony by Assistant Terminal Superintendent Claus, wherein Claus testified that not once during his post-accident interview with King did King claim that his anti-slip footwear prevented him from maintaining a secure foothold on the side of the railcar or that he could not maintain secure handholds and/or footholds on the side of the railcar because of the equipment he was wearing that day.
 {¶ 16} Terminal Superintendent Morris testified that during his post-accident interview with King, King stated that he had fallen off the railcar when he lost his grip. Morris further testified that King never mentioned: (1) his feet slipping off the railcar; or (2) anything about his anti-slip footwear, his having to wear a radio, his having to wear a remote control pack, or his having to carry a lantern, causing him to fall.
 {¶ 17} Claus testified that he never received any complaints from anyone: (1) that the anti-slip footwear made it hard to hang onto a railcar; or (2) that wearing a radio, boots, remote control pack and carrying a lantern made hanging onto a railcar difficult. *Page 5 
 {¶ 18} Claus also testified that prior to King's accident he had worn the same anti-slip boots that King had worn, and that he had worn them on snowy, icy, and metallic surfaces. According to Claus, the boots performed as they were intended to perform:
 {¶ 19} "They keep you from falling if you're on ice. They keep you from slipping. They give you traction and they do what they're supposed to do."
 {¶ 20} Contradicting certain testimony by King, Claus additionally stated that CSXT employees are not required to carry their lanterns in their hand, or in any other particular way.
 {¶ 21} Morris testified that he had worn the anti-slip footwear and that he did not have any problems navigating concrete or tile surfaces. He additionally testified that since the anti-slip footwear has been used in the Toledo terminal, slip and fall injuries on ice had decreased in number.
 {¶ 22} Like Claus, Morris testified that no one ever complained to him that the anti-slip footwear or any of the other required equipment that King was wearing made holding onto the railcar difficult.
 {¶ 23} Morris additionally testified that King was not required to ride the railcar on the night in question; rather, he was allowed to choose whether he wanted to ride the railcar or not.
 {¶ 24} Former General Manager of the CSX Detroit Division, Peter Burrus, testified that CSXT began using the anti-slip footwear to prevent employees from slipping on snow and ice and because the boots provided a firm grip due the self-retracting *Page 6 
steel studs. He mentioned that the self-retracting studs allowed the wearer to use the boots on tile, carpet, or steel. Burrus also testified that he tested the boots by using them himself on both ice and snow conditions and that the boots were very effective in preventing slips, trips and falls. He stated that he walked across tile and carpet floors, locomotive steps and steel platforms of locomotives and that he felt the boots would prevent slips, trips and falls even on those surfaces.
 {¶ 25} Burrus also testified that he tested the boots on the sill steps of railcars and felt very comfortable that employees could easily maintain secure footholds while standing on sill steps. He further testified that conductors can choose either to ride the side of railcars or to walk along beside the railcars, when doing their work. Regarding lanterns, Burrus testified that conductors are not necessarily supposed to carry their lanterns in their hands, but rather that the lantern handle is designed so that it can either be held either in a hand or draped over an arm when the employee needs to ride the side of a railcar. He stated that common sense dictates how to hold the lantern, based on the design of the handle.
 {¶ 26} Over King's objection, CSXT presented a video to the jury. The video was produced by LaCrosse Footwear, Inc., the company that made the anti-slip footwear that King was required to wear on the night of the accident. The video depicts the boots in action. The individuals in the video wear the boots on a variety of surfaces, including concrete, metal, and ice. The video depicts an individual running with the boots on and *Page 7 
attaining traction on all three surfaces. The video clearly depicts the retractable nature of the studs in the boots.
 {¶ 27} Over the objection of CSXT, King presented the testimony of retained expert, Robert O. Andres, who opined that CSXT was negligent because: (1) it required King to wear the anti-slip footwear while standing on the sill step of the railcar; and (2) it required King to hold onto the ladder rung with one hand while using the other for the radio; this combined with the anti-slip footwear all increased the risk of King slipping and falling from the railcar.
 {¶ 28} Also the subject of vigorous dispute, on the part of both parties, was testimony by Joseph Tumasian, a former CSX conductor who was injured, approximately a year after King's accident, when he fell off a railcar while wearing a remote control vest, anti-slip footwear, and a radio, and while carrying a lantern in his hand. Following certain rulings by the trial judge, Tumasian was permitted to testify as to two issues: (1) the manner in which he was taught to hold his lantern; and (2) the railroad's response to his accident. He stated that he was taught to hold the lantern over his thumb, "because if we were to have on or our arms [sic] or got caught on another piece of equipment, bad things can happen." Finally, Tumasian testified regarding the railroad's response to his accident, stating:
 {¶ 29} "I was — they told me it was my fault that I fell off the car because I did not have a secure enough grip on the autorack. * * * They determined that I didn't have a secure enough grip because I fell from the car. * * * I was told, too, I was holding my *Page 8 
hands inappropriately. It should have been in the crook of my arm, contrary to everything I had been taught."
 {¶ 30} Following Tumasian's testimony, the trial court issued the following limiting instruction to the jury:
 {¶ 31} "Ladies and gentlemen, just a limiting instruction to you regarding the testimony from this witness regarding, it concerns where he fell. This occurred after the incident which is the subject of this case, so it was not presented to you in any way to be evidence of notice to the railroad of any conditions since it happened afterwards. The purpose of this testimony was — goes to the evidence that was presented regarding the manner in which the lantern was held, and the railroad's response and that's the only purpose for you to consider that testimony. It is not to be considered in any way as evidence of negligence on the part of the railroad or any notice that they may have had.
 {¶ 32} At the end of the trial, the jury rendered a verdict in favor of CSXT, finding that it was not negligent under the FELA and, therefore, not responsible for King's alleged injuries. On September 14, 2007, King filed motions for judgment notwithstanding the verdict and for a new trial. By order dated December 4, 2007, the trial court denied these motions. On December 21, King filed a notice of appeal. On December 31, 2007, CSXT filed a notice of cross-appeal. *Page 9 
 {¶ 33} In this appeal, King raises the following assignments of error:
 {¶ 34} I. "THE TRIAL COURT ABUSED ITS DISCRETION BY PRECLUDING APPELLANT'S WITNESS JOSEPH TUMASIAN FROM TESTIFYING ABOUT UNSAFE CONDITIONS ON THE RAILROAD."
 {¶ 35} II. "THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING APPELLEE TO SHOW A LACROSSE FOOTWEAR `PROMOTIONAL VIDEO' TO THE JURY THAT LACKED ANY EVIDENTIARY FOUNDATION AND WAS IRRELEVANT."
 {¶ 36} III. "THE TRIAL COURT ABUSED ITS DISCRETION BY MAKING ARBITRARY AND INCONSISTENT EVIDENTIARY RULINGS."
 {¶ 37} IV. "THE TRIAL COURT ABUSED ITS DISCRETION BY GIVING AN OVERBROAD AND INCORRECT LIMITING INSTRUCTION FOLLOWING THE TESTIMONY OF JOSEPH TUMASIAN."
 {¶ 38} V. "THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO GIVE ANY LIMITING INSTRUCTION TO THE JURY FOLLOWING THE LACROSSE VIDEO DESPITE APPELLANT'S TIMELY REQUEST FOR SAME."
 {¶ 39} VI. "THE TRIAL COURT ABUSED ITS DISCRETION BY GIVING INCONSISTENT AND INCORRECT LIMITING INSTRUCTIONS."
 {¶ 40} VII. "THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR A NEW TRIAL." *Page 10 
 {¶ 41} CSXT raises as its sole cross-assignment of error:
 {¶ 42} I. "THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING APPELLANT'S WITNESS, ROBERT O. ANDRES, TO OFFER EXPERT OPINIONS ABOUT A SUBJECT MATTER BEYOND HIS QUALIFICATIONS AND WHICH WERE NOT BASED ON SOUND AND GENERALLY ACCEPTED SCIENTIFIC METHODOLOGY."
 {¶ 43} Although King sets forth seven assignments of error, he really only addresses two issues: (1) the trial court's limiting instruction as to Tumasian's trial testimony (which is addressed by King's first and fourth assignments of error); and (2) CSXT's use of the LaCrosse Footwear, Inc. video (which is addressed by King's second and fifth assignments of error).
 {¶ 44} We will begin by examining the trial court's limiting instruction as to Tumasian's testimony. Specifically at issue is the trial court's instruction that the jury was not to consider Tumasian's testimony "in any way as evidence of negligence on the part of the railroad."
 {¶ 45} In conducting this examination, we are mindful that a trial court enjoys considerable discretion in the admission or exclusion of evidence and will not be reversed absent a clear abuse that has materially prejudiced the defendant. Kelley v. Carins Bros., Inc.
(1993), 89 Ohio App.3d 598, 611.
 {¶ 46} Evidence of former accidents is admissible to show both an unsafe condition and a defendant's knowledge of such condition "provided the relevancy of such *Page 11 
evidence appears from the occurrence of the former accidents under substantially similar circumstances and the instrument or agency which caused the danger was in substantially the same condition at the time such other accidents occurred as at the time of the accident of which complaint is made, and is not destroyed by their being so remote as to defeat the inference of persistence of the dangerous condition to the time of subsequent injury; and provided further that there will not result, from the admission of such evidence, confusion of issues, unfair surprise, or prejudice disproportionate to the value of such evidence."Cottman v. Federman Co. (1942), 71 Ohio App. 89, 91; see, also, Evid. R. 403(A) (providing that evidence, although relevant, "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury").
 {¶ 47} Assuming arguendo that the evidence that King sought to introduce was relevant to show an unsafe condition, we must next determine whether the probative value of the evidence was substantially outweighed by the danger of undue prejudice or of confusion of the issues. See Cottman, supra; Evid. R. 403(A).
 {¶ 48} In considering the instant case, we note that the trial judge, in a bench discussion held outside of the jury's presence, expressed concern that allowing the disputed testimony might lead to confusion on the part of the jury. Specifically, the judge stated:
 {¶ 49} "That's the concern I have. It happened after and it just would logically cause the jury * * * cause the jury to logically start thinking about the similarity between *Page 12 
something that happened after the accident to the plaintiffs situation and so I can understand the defendant's fear of that. * * *"
 {¶ 50} Evidence of the Tumasian accident, which occurred after King's accident, was clearly not appropriate to show CSXT's knowledge of an unsafe condition in this case. We find that the trial court was justifiably concerned that the admission of Tumasian's testimony for the limited purpose of showing an unsafe condition (as opposed to both an unsafe condition and CSXT's knowledge of an unsafe condition) could mislead the jury or result in confusion of the issues.
 {¶ 51} Even if the trial court erred in excluding the disputed testimony, we would be compelled to find such error harmless. "Unless an error in the exclusion of evidence has affected a party's substantial rights, such error will be deemed harmless." Kelley, supra, at 611; see, also, Civ. R. 61. Here, evidence of the alleged unsafe condition was admitted through the testimony of various other witnesses, including King himself; King's expert, Robert O. Andres; CSXT locomotive engineer Rob Bloedow; and CSXT locomotive engineer Abe Vasquez. Any evidence by Tumasian regarding the unsafe condition would have been merely cumulative.
 {¶ 52} For the foregoing reasons, King's first and fourth assignments are found not well-taken.
 {¶ 53} Next, we examine the admission into evidence of the LaCrosse Footwear, Inc. video. According to King, it was error to admit the video because: (1) the video was irrelevant; (2) the video lacked a proper foundation; and (3) the trial court failed to issue a *Page 13 
limiting instruction informing the jury "that the video was not presented to prove CSXT's reliance thereon when requiring its employees to wear the spiked overshoes."
 {¶ 54} "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. "Evidence which is not relevant is not admissible." Evid. R. 402. King argues that since the video does not depict anyone riding the side of a moving railcar or engaged in "railroad operations," such as walking on ballast, the video is irrelevant.
 {¶ 55} As indicated above, the video depicts the boots in action. In the video, the boots are worn on a variety of surfaces, including concrete, metal, and ice. The video shows an individual running with the boots on and attaining traction on all three surfaces. It refutes claims by appellant that the boots are awkward, or that they provide no traction on slick surfaces. In addition, the video clearly depicts the retractable nature of the studs in the boots, thereby addressing another point of contention in this litigation. In sum, the video is relevant to this case because it makes King's claims about the dangerous nature of the boots less probable.
 {¶ 56} Evid. R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the material in question is what its proponent claims." When admitting photographic evidence, the utmost precaution should be exercised to make certain that the photographs submitted to a jury have been identified as true likenesses of *Page 14 
the objects photographed at the time of the occurrence under consideration in the case. St. v. McQueen (June 30, 1988), 7th Dist. No. 86 C.A. 102.
 {¶ 57} In the instant case, testimony by Vice President of Production for LaCrosse Footwear, Inc. Robert Rinehart established that the video (which Rinehart described in detail) was made to depict, and in fact accurately depicted, the anti-slip footwear's performance on concrete, metal and icy surfaces. Such testimony was sufficient to authenticate the video in this case.
 {¶ 58} Based on all of the foregoing, we conclude that the trial court did not abuse its discretion by permitting CSXT to show the video to the jury. Accordingly, King's second assignment of error is found not well-taken.
 {¶ 59} Lastly, we consider King's claim that the trial court abused its discretion by refusing to give any limiting instruction to the jury following the showing of the LaCrosse video. Specifically, King claims that the trial court should have told the jury that the CSXT did not rely on the video in requiring its employees to wear the spiked overshoes.
 {¶ 60} We initially note that CSXT never offered the video to show the company's reliance on it prior to the date of King's accident. In addition, counsel for King brought to the jury's attention certain testimony by LaCrosse representative Rinehart wherein Rinehart stated that, to the best of his knowledge, the video was made "in the latter part of 2005 to the early part of 2006." Such was clearly after the January 20, 2005 accident. *Page 15 
On the basis of the foregoing, we find that a limiting instruction was unnecessary and, thus, within the trial court's discretion to omit.
 {¶ 61} We additionally note that although a request for a limiting instruction was made by King at some point prior to the showing of the video, the request was never timely renewed. At the time the request was made, the trial court neither granted nor denied the request, but instead decided to hear whether CSXT would present a proper foundation for the video. Thereafter, the jury heard testimony from Assistant Terminal Superintendent Claus. After Claus's testimony, counsel for CSXT attempted to play the videotape. The court asked counsel to chambers to discuss the videotape and a lengthy discussion was held. During this discussion, no limiting instruction was requested. Thereafter, portions of Rinehart's deposition transcript were read into the record by both parties. Prior to the playing of the video, King's counsel renewed his objection to the video; however, he did not request a limiting instruction. Even after the showing, King's counsel failed to request a limiting instruction.
 {¶ 62} Civ. R. 51(A) pertinently provides:
 {¶ 63} "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."
 {¶ 64} In the instant case, counsel for King did not make a timely request for a limiting instruction, nor did he at any time object to the absence of an instruction. As a *Page 16 
result of these failures, King is precluded from raising the issue on appeal. Accordingly, King's fifth assignment of error is found not well-taken.
 {¶ 65} In light of our determinations regarding King's first, second, fourth and fifth assignments of error, we find his third, sixth, and seventh assignments of error to be moot. We likewise find CSXT's cross-assignment of error to be moot.
 {¶ 66} For all of the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Arlene Singer, J., William J. Skow, P.J., and Thomas J. Osowik, J., concur. *Page 1